UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

vs.

DAVID ANDERSON,

         Defendant.

_____

DECISION AND ORDER
06-CR-6229 CJS

## INTRODUCTION

The matter is before the Court on the defendant's motion to suppress physical evidence taken from him on January 13, 2005, and statements purportedly made by him on December 22, 2005, and, as well as to suppress his identification by seven potential Government witnesses. With respect to the application to suppress statements and physical evidence, a hearing was held on July 28, 2008, and August 28, 2008, at which three witnesses, Officer Jennifer Morales, Officer Lazio Tordai, and Sergeant Robert Mattick, testified. With respect to the application to suppress identification testimony, both the Government and the defendant agreed that the completion of the hearing should await disclosure of the names of the identification witnesses, which will occur no later than three weeks before any scheduled trial date.  In that regard, if the witnesses and the defendant were in fact well known to each other, as the Government maintains, the need for any hearing  would be obviated. As to the motion to suppress statements and physical evidence, the Court has now had a chance to consider both the testimony of the witnesses and the exhibits received into evidence. For the reasons

discussed below, the defendant's application to suppress is denied in part and granted in part.

## FINDINGS OF FACT

Lazio Tordai ("Tordai") is a police officer with the City of Rochester Police Department and has been so employed for approximately six and a half years. On January 13, 2005, at about 4:35 p.m., when assigned to the Patrol Division East, he had occasion to be in the vicinity of 39 Meade Street in the city of Rochester. He was in a patrol vehicle and had been dispatched to that location by the 911 Center in regards to vice activity. Tordai knew that Meade Street was a hot area for open air drug sales. Upon arriving, Tordai observed two males inside a vehicle in front of 39 Meade Street. The vehicle was a gold 1993 Oldsmobile bearing New York license plate number UDDA 5585. Tordai immediately approached the Oldsmobile in an attempt to identify the occupants. That is, he did not observe the Oldsmobile and its occupants for any length of time before he approached the vehicle. He may have parked his patrol vehicle behind the Oldsmobile, but did not in any way block the Oldsmobile with his patrol car. Tordai considered what he was doing a traffic stop and conducted himself accordingly. He approached the driver's side on foot, and did not have his service weapon drawn. Tordai introduced himself, asked for a driver's license and asked for an explanation why the occupants were at that location. He also obtained some pedigree information, and requested identification from both occupants.  After obtaining the identification, he returned to his patrol car to call in what is referred to as a "29" to see if either occupant of the vehicle had any warrants outstanding. Tordai learned that the defendant, who

was one of the occupants of the vehicle had an outstanding warrant for False Impersonation. After learning this information, Tordai, assisted by another police officer, who arrived at the scene, had the defendant and the second occupant of the vehicle, a male with the last name of Briggs, step out of the vehicle. Tordai handcuffed the defendant, searched him, and placed him in the rear seat of his patrol car. During the course of his search of the defendant's person, Tordai found a walkie-talkie and a package containing numerous empty glassine baggies, which, in Tordai's experience were used to package drugs. Subsequently, Tordai issued the defendant an appearance ticket, and released him from custody.

Jennifer Morales ("Morales") is a police officer with the City of Rochester Police Department and has been so employed since October of 1993. Since 1999, she has been assigned to the Special Investigations Section ("SIS"). On December 22, 2005, pursuant to her duties with the Rochester Police Department, she participated in the execution of a search warrant for the residence at 803 Maple Street in the city of Rochester. After entering 803 Maple Street, Morales located the defendant and his girlfriend, Tanisha Henry ("Henry"), and Henry's two children in bed in the rear bedroom on the first floor. Both the defendant and Henry were undressed. Morales handcuffed the defendant, after which he asked her if he could put on the jeans that were right next to the bed. Neither Morales or any other police officer said anything to the defendant prior to him asking for permission to put on the jeans. However, before the defendant was allowed to put on the jeans, Officer Myron Moses ("Moses"), who was with Morales, searched them and found $645 in the right rear pants' pocket and a clear plastic bag containing marijuana in the right front pants' pocket. Moses requested Morales to

photograph the items, which, she did, after the money and marijuana were laid on top of the jeans. The defendant then asked, in sum and substance, if he could have his jeans, and was, at that point, permitted to put them on.

Subsequently, Morales, in searching the premises, found two sets of keys on key chains on the kitchen table, and she tried the keys in the doors at 803 Maple Street. One key chain had several house keys and the other key chain had only two keys, one of which opened and unlocked the side door to 803 Maple Street. At the time Morales seized the the keys, the defendant was restrained and seated in the dinning room, which was right off the kitchen, and was in a position to observe Morales. As Morales placed the keys into an evidence bag, the defendant asked, "What are you doing with my keys?" Neither Morales or any other officer said anything to him before he asked this question. Also found during the course of the search of 308 Maple Street in the kitchen, in plain view on the kitchen table, was a twenty-five gallon-size clear plastic bag which contained 24 smaller clear bags each containing marijuana

Parole Officer Ronan ("Ronan"), who was part of the search team, entered the dining room of 803 Maple Street during the time the defendant was seated and restrained in that area. Morales was present in the dining room prior to Ronan entering. Ronan was the defendant's parole officer. When Ronan entered the dining room, the defendant looked up at him and said, "Oh, you're the one that fucked up the whole investigation for them." The defendant then looked at Morales as well as other police officers present and said, "I know what kind of car you drive, I know what kind of car you drive, and I know what kind of car you drive." Neither Ronan nor anyone else said anything to the defendant before he made these comments. However, after the

defendant made these comments, Morales asked the defendant to be seated, to be respectful, and to stop talking like that. The defendant, though, continued saying that Ronan "screwed up" the investigation. Within the month previous to the execution of the search warrant at 308 Maple Street, Morales, Ronan, as well as other officers, had conducted surveillance on the defendant and his family. On that occasion, the defendant pulled up right next to Ronan, who was in an unmarked vehicle, requested that he roll down his window, and then asked. "Officer, can you tell me what time is it?"

Later, while the defendant was still in the dining room, Morales, who was then either in the dining room or kitchen, asked Trooper Bernard, who was also part of the search team, if he could transport Henry to the Public Safety Building. At that point, the defendant stated that all of the weed was his and that it wasn't hers. Immediately prior to the defendant stating this, no one had said anything to him.

Subsequently, the defendant was transported from 803 Maple Street to the Public Safety Building. Upon arriving at the Public Safety Building, the defendant was taken to the third floor.

Robert Mattick ("Mattick") is a sergeant with the Rochester Police Department. On December 22, 2005, he participated in the execution of the search warrant at 308 Maple Street, after which he went to the Public Safety Building. After arriving at the Public Safety Building, Mattick became aware that the defendant was in the third floor holding area, that he was very agitated and upset, that he was being abusive to officers, and that he was making statements to other suspects who were being brought into the building. Mattick, who was on the third floor in proximity to the defendant, heard the defendant, who was handcuffed, telling other suspects, in sum and substance, "Don't

talk to the police, they don't give a shit." The defendant also said that he wouldn't cooperate, although he was asked to do so both at 308 Maple Street and at the Public Safety Building.  Mattick went over to the defendant and asked him to calm down several times. Mattick told the defendant words to the effect, "Relax, you've got to get through this, relax, cooperate with us, we'll get this squared away, work on this down the road."  Despite this, the defendant continued to tell other suspects in the area not to talk to the police. As a result of this conduct on the part of the defendant, Mattick decided to move the defendant to the fourth floor. He was assisted by Lieutenant Clark ("Clark") and Officer Cole ("Cole"). The defendant was taken by elevator to the fourth floor. While on the elevator, the defendant threw his coat on the floor after asking for it, and said, "Go ahead and lock me up and I'll do my twenty years, you put my father in prison for twenty years, I'm not afraid of prison." Before the defendant made these comments, either Clark or Cole may have told the defendant that he was looking at twenty years, although Mattick doesn't recall either of them saying this.

When the elevator arrived at the fourth floor, the defendant was taken into a locked holding facility that contained several interview rooms. At that point, Morales, who had been taking a statement from Henry in one of the interview rooms on the fourth floor, opened the door to the room slightly and stepped outside when she heard loud voices. Upon doing so, she observed the defendant, who was handcuffed and in the custody of Cole and Mattick, walking by. At that time, the defendant looked toward Morales and towards the inside of the interview room, and said, "Yo T don't tell them shit; don't tell them nigger shit; I'll kill you if you tell them shit; don't tell them shit T." While at 308 Maple Street, Morales had heard the defendant refer to Henry as "T."

When the defendant made these statements, Mattick was able to see Henry inside the interview room. The defendant's statements were not in response to any comment by any police officer, and Mattick had no idea that the defendant would come into contact with Henry on the fourth floor. After the defendant made the statements, Mattick had him returned to the third floor.

## CONCLUSIONS OF LAW

A.  **January 13, 2005**

> With respect to the events of January 13, 2005, the defendant
>
> submits that the evidence (what there is of it) shows that the occupants of the vehicle were "seized" without reasonable suspicion to believe that they were engaged in wrongdoing, pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). The Defendant further submits that the circumstances of the encounter, the conversation and taking of the identifications back to the patrol vehicl, would lead a reasonable person to believe he was not free to leave. *See Flordia v. Bostick*, 501 U.S. 429, 436-37 (1991).
>
> Based upon the above, Officer Tordai did not have reasonable cause to seize the Defendant and search his person and the vehicle. Therefore, the evidence must be suppressed.

Defendant's Letter Memorandum (September 19, 2008).

> As to the defendant's argument, it is, of course, well settled that
>
> [a]n individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As *Terry v. Ohio*, *supra*, recognized, people are not shorn of all Fourth Amendment

> protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles. See *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).
>
> Accordingly, we hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment.

*Delaware v. Prouse*, 440 U.S. 648, 663 (1979)(footnote omitted).  Moreover,

> In determining whether the facts available to law enforcement officers at the time of a stop support a reasonable suspicion, two basic principles must be kept in mind. First, the circumstances surrounding the stop must be viewed as a whole, not as discrete and separate facts. *United States v. Vasquez*, 612 F.2d 1338, 1343 (2d Cir. 1979); *United States v. Price*, 599 F.2d 494, 501 (2d Cir. 1979). Second, these circumstances "are to be viewed through the eyes of a reasonable and cautious police officer on the scene guided by his experience and training." *United States v. Price*, supra, at 501, quoting, inter alia, *United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977); *United States v. Magda*, 547 F.2d 756, 758 (2d Cir. 1976), *cert. denied*, 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977).

*United States v. Delos-Rios*, 642 F.2d 42, 45 (2d Cir. 1981). Finally,

> Whenever an anonymous tip first alerts police to possible wrongdoing, the question to be answered is whether the "tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop. " *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (internal citation omitted).

*United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir. 2006).

Applying these principles of law to its Findings of Fact, the Court concludes that the defendant's application to suppress must be granted. Tordai arrived in the area of 39 Meade Street based on what, as far as the evidence presented, was an anonymous and unsubstantiated report of vice activity. Upon arriving at 39 Meade Street at about

4:35 p.m., he did not observe the Oldsmobile occupied by the defendant and Briggs for any period of time, but rather approached it immediately, demanded license and identification, and took the documents with him back to his patrol car once they were provided.  The Court finds that  no reasonable person, in the defendant's position, would have thought  that he was free to leave at that point. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Moreover, the Court finds that, although Tordai knew Meade Street to be an area in which open air drug sales occurred, the totality of circumstances did not provide him reasonable suspicion to effect what he himself considered as a traffic stop, nor to direct that the defendant and Briggs provide him with license and identification.

## B.    December 22, 2005

The Government maintains that the statements of the defendant which it seeks to introduce  at trial are admissible as spontaneous statements. The defendant, on the other hand, argues that such statements were acquired in violation of his Fifth Amendment rights as guaranteed by *Miranda v.  Arizona*, 384 U.S. 436 (1966). In this regard, the defendant's

> Fifth Amendment claim turns on whether his incriminating statement was volunteered or the product of interrogation.
>
> \*         \*         \*
>
> The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.... Volunteered statements of any kind are not barred by the Fifth Amendment ....
> *Id.* at 478, 86 S.Ct. at 1630; see also *United States v. Carpenter*, 611 F.2d 113, 117 (5th Cir.), *cert. denied*, 447 U.S. 922, 100 S.Ct. 3013, 65 L.Ed.2d 1114 (1980) (spontaneous, unprovoked incriminating statement is admissible).

> The standard for determining whether a statement is the product of interrogation is outlined in *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689-90, 64 L.Ed.2d 297 (1980) (footnotes omitted): ["]We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. This is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.["]

*United States v. Guido*, 704 F. 2d 675, 676-77, (2d Cir. 1983). The defendant's statements at issue are as follows:

> While in the bedroom, in which he was arrested, the defendant asked Morales on two occasions if he could put on the jeans that were next to the bed, in which the $645.00 in U.S. currency and plastic bag containing marijuana were found.
>
> While restrained in the dining room, the defendant asked Morales, "What are you doing with my keys?"
>
> While restrained in the dining room, the defendant stated to Ronan "Oh, you're the one that fucked up the whole investigation for them," and then he looked at Morales as well as other police officers present and said, "I know what kind of car you drive, I know what kind of car you drive, and I know what kind of car you drive." Although Morales asked the defendant to be seated and be respectful, and told him to stop talking like that, he continued saying that Ronan "screwed up" the investigation.
>
> While still in the dining room, the defendant stated that all of the weed was his and it wasn't hers, when Morales asked Trooper Bernard to transport Henry to the Public Safety Building.
>
> While on the fourth floor of the Public Safety Building and in view of Henry who was being interviewed by Morales, the defendant said, "Yo T don't tell them shit don't; tell them nigger shit; I'll kill you if you tell them shit; don't tell them shit T."

Based upon its Findings of Fact, the Court concludes by a preponderance of evidence that none of these statements on the part of the defendant was made in

response to any questioning, or its functional equivalent on the part of any police officer. In regard specifically to the statements attributed to the defendant at the Public Safety Building, the Court concludes that Mattick did not bring the defendant to the fourth floor for the purpose of an encounter with Henry, but rather because the defendant was being disruptive on the third floor.

## CONCLUSION

Accordingly, the defendant's motion to suppress (Docket # 248) is granted in part as to physical evidence seized from him on January 13, 2005, and denied in part, as to statements allegedly made by the defendant on December 22, 2005.

It is So Ordered.

DATED:   Rochester, New York
         January 6, 2009

                                ENTER.

                                /s/ Charles J. Siragusa
                                CHARLES J. SIRAGUSA
                                United States District Judge